Herbert, J.,
dissenting. Although I agree with the statement in the per curiam opinion that ordinarily this court will not substitute its judgment on questions of fact for that of the commission, it clearly appears to me after a thorough examination of the record in this case that the order of the commission is not only against the manifest weight of the evidence but even shows an abuse of discretion.
There are no passenger-train movements on this so-called main line consisting of a single track. The switch-engine operation on the spur track should be eliminated from consideration since a train-crew member is required to act as a flagman at the crossing at such times. Under those circumstances, a flasher-light signal would only be confusing.
*416 As to the four daily freight trains, two northbound movements take place between 10 a. m. and 2 p. m. and two southbound movements take place, one around midnight and the other between 4 and 5 a. m. Generally these four freight trains cross Oakland Park Avenue at about 20 miles per hour as they approach or leave the yard, about one mile to the south. While the 24-hour traffic count discloses a total of about 5,500 vehicles during that time, examination of that count, as it is broken down into 15-minute and one-hour periods, shows a total of 125 vehicles (east and west) in the five hours after midnight and l, 033 vehicles in the four-hour period between 10 a. m. and 2 p. m. This presents a different view of the vehicular traffic volume from that adopted by the examiner and the commission.
Besides the complainant himself (who testified that in his opinion all grade crossings should have train activated automatic protective devices), there were only three main witnesses who testified on his behalf. They were a captain in the Columbus police department in charge of the traffic division, the chief traffic engineer for the city of Columbus and the supervisor of school busses for the Columbus public schools. The police captain stated that in his opinion, based solely upon the volume of traffic crossing the track at that locality “plus the physical layout of the surrounding terrain and buildings which might tend to cut down sight distances or the observation of a'train approaching,” this crossing is a dangerous crossing. He was not familiar with the number of trains that frequent that crossing or the speed of the train movements. The chief traffic engineer testified as to the vehicular traffic count and declared the crossing to be hazardous, stating, “ all I could say is that it would be a hazardous crossing based on the sight distance and would— could be accepted as dangerous in that respect because of the sight distance.” The third witness, the supervisor of school busses, also termed the crossing dangerous in his opinion, although he likewise testified that only one public school bus went over the crossing at 8 o ’clock in the morning, returning at about 3:55 p. m. This witness also shared the view of the complain *417 ant that all grade crossings should have flasher-light protection. None of these witnesses even knew about the classification of this crossing by the Director of Highways under the provision of Section 5524.01, Eevised Code, until the hearing before the examiner.
It is disturbing to note that not only were these three major witnesses ignorant in this respect but also that the hearing examiner and the commission disregarded and gave no consideration to the determination by the Director of Highways that this crossing rated a priority classification of “V,” one rating removed from priority grade “VI” which is assigned to the safest crossings. Granted that the Legislature, when it enacted Section 5524.01, Eevised Code, in 1957, did not remove from the Public Utilities Commission its authority or responsibility to determine dangerous crossings for the purpose of requiring the installation of crossing gates or flasher lights (Section 4907.47, Eevised Code), nevertheless by its enactment of this section it established new responsibilities for the Director of Highways and even provided for a formula to determine the probability of accident at each crossing, taking into account such crossing factors as volume of vehicular traffic, volume of train traffic, train type and speed, limitations of view, intersection angle, number of tracks, highway alignment and other special factors and conditions. For the commission to disregard the “V” rating of this particular crossing by the director and to base its determination that the crossing is dangerous upon consideration of only two of the eight factors which the director is required to consider in rating a crossing as to probability of accident seems to me to defeat in part the legislative purpose in the 1957 enactment of this provision.
The report of the railroad inspector assigned by the commission to investigate this crossing found it to be not sufficiently dangerous to require more warning-sign protection than it already has. Apparently, although no mention is made in the attorney-examiner’s report of the flasher-light protection at the crossings of this track over Morse Eoad and Eoute 161 (two *418 roads well to the north of Oakland Park), as brought out on cross-examination of the railroad witnesses, it improperly affected his recommendation even though it was not developed in the record whether those two crossings had any relation to the crossing at Oakland Park, particularly as to train speed, train and traffic volume or sight distances. One deputy sheriff testified as to a report on file in the sheriff’s office relating to one accident between a train and an automobile of which he had made no investigation and had no knowledge. In my view, this evidence was without proper foundation and improperly admitted.
For all the foregoing reasons, I would reverse the order under review.